## MARCUS SAYRE et al.

### v.

## THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK et al.

### [Filed March 11th, 1899.]

A corporation employs from fifteen to twenty-five men in conducting a busi-
ness upon leased land bordering upon the Passaic river, a tidal stream.   The
city of Newark proposes to build a sewer, through which a large quantity of
sewage will be discharged into the stream at a point fifty-five feet from com-
plainant's premises.   It is clear that the sewage at certain recurring periods
of each year will create a stench which will be very offensive to the officers
and employes of the complainant while transacting the business of the com-
pany upon the premises, and will impair the value of its property.—*Held,* that,
although the injury is only anticipated, it will be enjoined.

---

On bill, answer and proofs.

*Messrs. McCarter, Williamson & McCarter,* for the com-
plainants.

*Messrs. Coult & Howell,* for the defendants.

REED, V. C.

The bill is filed to restrain the defendants from building a sewer, through which the city of Newark proposes to discharge into the Passaic river, at a point fifty-five feet north from the property of the complainant, two million and sixty-five thousand gallons of house sewage every twenty-four hours. Marcus Sayre is the owner of a tract of land on the west side of the Passaic river in the city of Newark, adjoining on the south the property of the New Jersey Railroad and Transportation Company and the Centre Street bridge.

The property has a frontage of two hundred feet on the river, and runs back two hundred and thirty-seven feet to Front street.

Marcus Sayre owned the property for many years prior to 1891, and used the same for a brick, lime, cement and masons' materials business. The Marcus Sayre Company was formed in 1891, and leases the property from Marcus Sayre and carries on the same business formerly transacted by Mr. Sayre. A large part of the materials used upon the premises are brought there by boats and scows. In addition to Mr. Sayre himself, there are upon these premises daily from thirteen to twenty-five men engaged in transacting the business of the company.

On April 21st, 1898, the board of street and water commissioners of the city of Newark passed an ordinance for the construction of a sewer in Market street, from Arlington to Plain street, through Plain street to Warren street, through Warren and Halsey and West Park streets to Broad street; thence across Military Park to Saybrook Place, through it to the easterly line of Front street, then across the Pennsylvania railroad line to the Passaic river. The outlet of the sewer is to be six feet in diameter and the area to be drained of house and surface-water sewage is two hundred and ninety-five acres in the most thickly propulated part of the city of Newark.

There are now within the limits of the city of Newark nine sewers. Above the point fixed for the outlet of the proposed sewer there are the following sewers draining into the river : The Montclair Railway sewer, which is an outlet of the Orange system, and which it is estimated delivers six hundred and twenty-five

thousand gallons each hour; a short distance south of this sewer is the Vernon Avenue sewer at the railroad bridge, which drains two hundred and forty-seven acres, and is estimated to deliver ten thousand two hundred and ninety gallons each hour; then at some distance south of this is the Gully Road sewer, draining three hundred and sixty-eight acres and delivering eleven thousand six hundred and ten gallons each hour; then south of this is the Fourth Avenue sewer, draining one hundred and sixty-four acres, and delivering forty thousand two hundred and ninety gallons of sewage each hour; south of this is the Carlisle Place or Millbrook sewer, which drains eighteen hundred and sixty acres and delivering seven hundred and ninety-six thousand five hundred gallons of sewage each hour; then still further south is the Ballantine Dock sewer, which drains two hundred and twenty-two acres and delivers one hundred and sixty-two thousand gallons each hour. The outlet of the Ballantine Dock sewer is two hundred and fifty-four feet north from the property of the complainant.

The sewers below the proposed outlet of the new sewer are, first, the City Dock sewer, two thousand feet south of the Ballantine Dock sewer, which drains five hundred and sixty-two acres, and delivers four hundred and eighty-five thousand four hundred and sixty gallons each hour; then the Jackson Street sewer, draining three hundred and thirty-one acres, and delivering one hundred and twenty-two thousand eight hundred and fifty gallons each hour; and last, the Freeman Street sewer, draining eighty-seven acres, and delivering forty-eight thousand six hundred gallons each hour. The total amount of sewage voided by all of these sewers is one million seven hundred and forty thousand and forty gallons each hour, or forty-one million seven hundred and sixty thousand nine hundred and sixty gallons each day.

In addition to the sewage thus entering the river at Newark, it receives the sewage of Paterson, Passaic, and the small villages bordering upon the river above Newark.

The volume of water into which this sewage is discharged varies with the seasons. In dry seasons the quantity of the

fresh water from the water-sheds which drain into the Passaic river above Newark, is calculated at one hundred and fifteen to one hundred and twenty-five million gallons per day. In addition there is at Newark the water produced by the tidal flow. The tidal wave reaches a point above Newark, and every six hours the inflow from the bay meets the fresh-water flow of the river and causes a rise in the mean height of the natural flow of the river. Mr. Harrison takes, as I understand him, the mean or average height of the natural flow of the river, and the mean or average height of the river at high tide, and has made a calculation of the amount of water in the river above the Centre street bridge at mean high tide, in excess of the water in the river at mean low tide. He computes it at five hundred and ten million gallons. Twice a day this volume of water is bunched up above Centre street bridge, and twice a day, as the tide recedes, flows down past the Centre street bridge. The tidal inflow, as I understand it, arrests the downward flow of the river, mingles with its waters, and together with the six hours' natural flow of the water down the stream, constitutes the contents of the tidal prism, i. e., five hundred and ten million gallons. The remaining part of the twenty-four hours, viz., twelve hours, the natural flow of the river, in addition to the contents of the tidal prism, passes down. If the contents of the tidal prism were invariable, then each day, according to this calculation, ten hundred and twenty million gallons of water would pass Centre street bridge, which in addition to the natural flow of the river every twelve hours, which in dry weather would be about sixty million gallons, would make a total of ten hundred and eighty million gallons.

Now, the proportionate amount of house sewage which can be discharged into a stream without creating a nuisance is stated by the engineers to be in the proportion of one to fifteen or one to twenty, and it is stated that a larger proportion of sewage would so foul the stream as not merely to render the waters undrinkable, but actually noxious to the senses.

If the estimate of the amount of all the sewage voided each day along the stream its entire length is correctly estimated at

seventy millions of gallons, then, according to this theory, it would require at least fifteen times as many, or eleven hundred and five millions of gallons of water to dilute it. The quantity of water which daily passes Centre stieet bridge in dry weather is, according to calculation, ten hundred and eighty million gallons.

But it is insisted on the part of the city that the quantity of sewage is overestimated. It insists that the calculation should be based upon population, it being an admitted assumption that each person uses each day one hundred gallons of water, which passes into the sewers. It insists that the population whose sewage drains into the Passaic was not greater than four hundred thousand at the last census, and would produce forty million gallons each day, twenty-eight million gallons only of which, it is insisted, would be drained into the river within the limits of Newark, and a part of this is discharged below the outlet of the projected sewer.

Now, it is probable that the amount of sewage now poured into the river is less than seventy million gallons, and it is certain that the noxious character of the sewage voided into the river at Paterson and other points above, is in a degree destroyed by the purifying work of the nitrifying bacteria before it reaches Newark.

But on the other hand I think that the diluting effects of the tidal water, both as to quantity and movement, is overestimated. In respect to quantity the measurement is made in regard to mean tide. This means that at times there is more and at other times a less quantity of water in the tidal prism. It seems apparent that the point of inquiry is not whether sometimes, or even at most times, there is sufficient water in the river to dilute and remove the sewage, but whether at any considerable time each year there is less than enough to perform this office. The quantity of sewage voided each day is practically unvarying, but the quantity of the water in the river varies with the seasons and with the changing planetary influence upon the tides, or both combined. If the flow is so small for five or ten weeks of each year that the sewage becomes a nuisance, it is no answer to

say that it is sufficient for forty-two or forty-seven weeks in the year.

It is again to be observed that the tidal flow is in both directions, and the sewage voided upon the incoming tide is carried up with it until the tide turns, and then it comes down again until it meets another incoming tide, when it is again carried back a part of the distance it has already traveled, and so on until it reaches the place of discharge into the bay. Therefore, each tidal prism may flow down laden with not only the sewage which has been voided from the sewers within the six or twelve hours, but with sewage previously voided and which has been carried back by the inflowing waters.

In connection with this, the distance which sewage may be carried on one tide and how far it may return was the subject of considerable testimony. The testimony of Mr. Bassett is that it would take several tides to carry sewage to the bay from Newark, upon the assumption that the distance is ten miles. The distance to the point where the sewage passes into the bay is stated by a witness for the defendants to be six miles. If the latter distance is correctly stated, nevertheless I think it more than probable, particularly in dry weather, that it would require more than one tidal recession to clear the river.

At the trial much attention was given to the fact that the tidal water at Newark is in some degree saline. It was shown that salt water was antiseptic and inhibits the growth of bacteria. It was therefore pressed that its presence in the Passaic at Newark serves to assist in disinfecting the discharged sewage.

It is extremely difficult to conclude that the salinity of the Passaic river water will have any material effect upon sewage. Nor is the testimony as to the effect produced by sea water upon sewage emptied into the ocean or bays of much service.

For, according to the uncontradicted testimony of Mr. Bassett, there is only a trace of chlorine at Newark, the proportion of salt in the waters of the Passaic compared with the salt in sea water being as one to one hundred or one to one hundred and fifty.

Without further summing up the details of this line of evi-

dence, the effect of it is to leave an impression that at times of low water the river is likely to be very foul from the presence of sewage.    But I agree with Lord-Justice Turner in *Goldsmid* v. *Tunbridge Wells Improvement Commission, L. R. 1 Ch. App. Cas. 349*, and with Chancellor McGill in *Newark Aqueduct Co.* v. *Passaic, 18 Stew. Eq. 393*, that more weight is due to the facts proven in respect to the actual condition of the river than to conclusions to be drawn from theoretical opinions.    The testimony of the members of the Passaic river pollution commission and others proves the general filthiness of the river.    The natural beauty of the stream has been destroyed by the filth emptied into it from Paterson to the bay.    Its banks, which should be a favorite site for handsome residences, have become unfit for residential purposes.    A driveway projected to run along its banks was abandoned because of the offensive odors from the foul river.

But while the general foulness of the river is fully proved, the complainant's case mainly rests upon the fact that the projected sewer will empty its contents in close proximity to its property.

Much of the testimony in the case is directed to the query whether this discharge from this sewer, together with the general condition of the stream, is likely to endanger the health of those upon the premises of the complainant by the dissemination of the germs of disease.    The testimony taken upon this point leads me to believe that while sewage containing the germs of certain diseases, if left by receding tides to dry upon docks or boats might be disseminated by currents of air, yet, this result is not so probable or clearly proved as to afford a ground for relief.    Neither the theoretical views of the experts are so harmonious nor is the testimony as to the effect of the existing sewers so concurrent as to clearly prove the insistence of the complainant upon this point.

But I think it is clearly proved that, at certain seasons, the discharged sewage will cause a stench which will be very annoying to those near the sewer's outlet.    It is probably true that during those portions of the year when the flow of the river is undiminished by drought, and the weather is cool, the odors from the river, even at the point of the sewer's discharge, will

not be markedly offensive. When, however, the flow of the river becomes diminished by summer droughts, then this diminution of water, coupled with midsummer heat, will undoubtedly cause the exhalation of extremely nauseating odors. I draw these conclusions, not so much from the testimony which exhibits the quantity of fresh water that is likely to flow in the river and the quantity of tidal water which flows and ebbs past the point of discharge of the sewer, and the quantity, character and density of the sewage itself, as I do from what is proved in regard to the effect of similar conditions existing elsewhere along the river, within the limits of the city.

There is, as already remarked, about two hundred and fifty-four feet north from the complainant's land, the Ballantine sewer The testimony of Mr. Sawyer, the superintendent of Ballantine's, is that the stench from this sewer is so terrible that they have to close the windows in the engine-room in the hottest weather.

Mr. Walsh, the bridge-tender at the Centre street bridge, two hundred feet south of this sewer, says that the stench is very bad, worse at low tides and in dry summer weather. He says that all along the docks is black slime and mud sticking to the sides, and the stench from it for the last month has been very bad, and when the tide goes down you can see the slime sticking to the sides and the water is very dirty. It is worse in foggy or very hot weather.

Above is the Millbrook sewer, which empties into the river at the Clay street bridge. Mr. Bauer, a bridge-tender at the Clay street bridge, says that there comes from the sewer a foul stench, something fearful, and it has been so for the last two, three, four or six months. He says of course in summer time it is worse than it is in the winter time; that there is not much in the winter, but in the summer the stench is something awful; it is not fit for a man to stand there. He says "our house on the draw is, I should judge, seventy-five feet from the sewer, and when it gets very bad we have to close the windows, as we will sooner suffer the heat than the smell of the sewer."

Mr. Radcliffe, a tender of the same bridge on the East

Newark end, which is about three hundred and thirty feet from the mouth of the sewer, says "that the stench is awful at times, particularly at low tide." He says "we close the windows to keep the smell out. When there is no tide to carry it away the sewage stays there for an hour. It is worse in heavy weather when the stench cannot rise."

Mr. Gray, a real estate dealer, says "that he has noticed a stench come from the discharge of this sewer; that particularly one day he was there, the tide was quite low and there was a good deal of discharge of a black substance, which, as it flowed into the river slowly, without much tide, adhered to the boats or anything else which formed an obstruction in the river. There was a very offensive stench that came from this stuff."

The Jackson street sewer runs through the property of the Balbach Smelting and Refining Company. Mr. Zahn is the assistant superintendent of the works of that company, and he has averaged twelve hours a day for several years, at the works, near the sewer outlet. He says "that the contents of the sewer falling into the river cause an unbearable odor, especially at low tides. He has often smelt it for two squares and he has seen bushels of excrement held up by the boats."

The City Dock sewer empties into the Passaic river, about one hundred and fifty feet from the superintendent's office of the People's Power and Light Company. Mr. Conlin, who has been employed as a clerk by the company for four years, says that the smells from that sewer are very bad at times, particularly on foggy, wet, muggy days; that it is worse in hot weather, and some days they would have to close the windows and shut the doors on account of the smell.

Mr. William D. Hunt, one of the first Passaic river pollution commissioners, after stating the general foul condition of the river and that sewage was visible floating in the water, proceeded: "At the outlet of many of the sewers, at or near the outlet, there was a stench of a sewage character; the stench could not be mistaken."

Six of these witnesses are employed permanently near the point of discharge of these sewers. Their testimony cannot be

refuted by that of witnesses who visited the sewer at a certain time in June, and who testify that at that time they did not scent any disagreeable odor. At many times, probably at most times, there was no very perceptible fœtor. I have no doubt whatever that at times, at low water and hot weather, there was a stench of the most offensive description. All these witnesses testify to the existence of the very results which the proved conditions are calculated to bring about. The undiluted particles of sewage swept slowly back and forth by the tides, clinging to wharves and banks and boats, and left exposed by the retiring tides to be beat upon by a midsummer sun, would naturally stink.

Now, if it be true that the sewage from the present sewers causes these stenches at or near their mouths, it seems demonstrated that the proposed sewer will cause the same result, for there is nothing in the plans of construction of the latter sewer, at its mouth or elsewhere, which differs in any substantial particular from the construction of the existing sewers. And I may remark in respect to the perforation of the present sewer along its route, of the air-holes, that I do not perceive that it will in any substantial degree change the character of the sewage as it will be discharged into the river.

The condition of affairs thus presented is this: The defendants propose to pour in upon the property of the state (the Passaic river being a tidal stream) that which will create, during certain periods of each season, a stench which will make the lives of those upon adjoining property at times certain to recur again and again, extremely disagreeable.

If the premises of the complainant were used for residential purposes, the nuisance would be glaring. It is undoubtedly true that what would be a nuisance if near a dwelling may not be a nuisance if in a locality devoted entirely to business purposes. But, if the lives of Mr. Sayre and his employes are made uncomfortable during the working hours of the day by noisome smells, the result will be a diminution of the value of the property devoted to the business necessarily transacted upon these premises. Any condition which renders the lives of the opera-

tives substantially more unpleasant in the operation of the business, makes its transaction more difficult, and must result in a depreciation in the value of the property devoted to such business. Now, it seems to me, that if a private person should discharge, or threaten to discharge, on lands adjoining the premises in question, what the city of Newark proposes to discharge thereon, he would at once be enjoined from creating or maintaining a nuisance.

It remains to inquire whether the fact that this is to be done by a municipality, together with the fact that the place of discharge is a tidal stream, relieves the proposed discharge from the character which otherwise would be attributed to it.

It is to be observed at this point that the question in hand is not complicated by the existence of any statutory authority conferred upon the city of Newark to drain its sewage into the Passaic river. The question, therefore, whether it is within the scope of legislative power to authorize a municipality to create or maintain a nuisance, which amounts to the taking of private property without compensation, is not here presented. There is no legislation giving a special authority to the city of Newark to drain into the Passaic, and a general grant of power to construct sewers does not justify the creation of a nuisance. *Attorney-General* v. *Leeds, L. R. 5 Ch. App. 583; Seifert* v. *City of Brooklyn, 101 N. Y. 136; Haskell* v. *New Bedford, 108 Mass. 208, 215.* The extent of the right of the city, therefore, to drain its sewage into the Passaic river, must be measured by the application of general legal rules.

There is no doubt that in a degree riparian owners and municipalities may use adjacent bodies of water to dispose of and carry away refuse and impurities. *Gould Wat.* § *220; Kuehn* v. *City of Milwaukee, 92 Wis. 263; Merrifield* v. *Worcester, 110 Mass. 216.*

But, while the city may empty some sewage into a stream of water which flows through it, it cannot do so to an extent which will create a nuisance. Nor does it matter whether the stream is tidal or non-tidal. This is illustrated by the following cases, in some of which the waters were tidal and in others non-tidal:

*Attorney-General* v. *Leeds, supra; Attorney-General* v. *Birmingham, 4 K. & J. 528 ; Attorney-General* v. *Hackney Local Board, L. R. 20 Eq. 626 ; Goldsmid* v. *Tunbridge Wells, L. R. 1 Eq. 161; S. C. on appeal, L. R. 1 Ch. App. 349 ; Attorney-General* v. *Colney Hatch Lunatic Asylum, L. R. 4 Ch. App. 146 ; Attorney-General* v. *Acton Local Board, L. R. 22 Ch. Div. 221; Morse* v. *Worcester, 139 Mass. 389 ; Chapman* v. *City of Rochester, 110 N. Y. 273 ; State* v. *City of Portland, 74 Me. 268 ; Hayes* v. *Village of Dwight, 150 Ill. 273.*

Nor does the advantage to be derived by the public from the construction of the proposed sewer, nor the increased expense of another system of sewerage which the city may be compelled to substitute for the proposed one, afford any ground of excuse for inflicting a substantial injury upon private property. Therefore, neither the testimony in respect to the need for this sewer to drain, in connection with house sewage, the surface water from an area which is now imperfectly drained, nor the testimony in respect to the ease with which this purpose can be accomplished by the construction of other sewers, can be seriously regarded. While a sewer system of the city will not be interfered with for fanciful reasons, yet any substantial interference with private rights will be restrained. *Susquehanna Fertilizing Co.* v. *Malone, 73 Md. 268, 282 ; Attorney-General* v. *Birmingham, supra; Attorney-General* v. *Colney Hatch Lunatic Asylum, supra.*

Again, it is suggested that the new sewer is designed to merely assist the work of the existing sewers. A part of the sewage which now flows through the Ballantine Dock sewer and a part which now flows through the City Dock sewer will be delivered through the new sewer, together with the surface water from the flooded area already mentioned. It is, therefore, insisted that no more house sewage will be emptied into the river after than before the construction of the proposed sewer. This insistence is accurate, keeping out of view the natural increase of sewage produced by increase in population. But the complaint of the Marcus Sayre Company is that the sewage, instead of being discharged at a distance from its property, the nearest of which is two hundred and fifty-four feet on the one side and two thousand

feet on the other, will be brought within fifty-five feet, and that, therefore, they will be thus subjected to a greater degree of annoyance by reason of the proximity of their land to the new place of discharge.

It is again urged that the injury is anticipated, and that it should appear that the nuisance actually exists before an injunction goes. *Wolcott* v. *Melick, 3 Stock. 204; Duncan* v. *Hayes, 7 C. E. Gr. 25; Newark Aqueduct Co.* v. *City of Passaic, 18 Stew. Eq. 393; Attorney-General* v. *Manchester, L. R. 2 Ch. 87 (1893).*

The rule to be applied to anticipated nuisances is the same as that applied to existing nuisances. It must be clear that the nuisance will exist in the one instance just as it must be clear that it does exist in the other. In most cases of anticipated nuisances the particular condition which it is alleged will cause a nuisance differs in some respect from any other condition which has already caused a nuisance. The result to be apprehended from the conditions to come into existence can only be prejudged by theoretical opinions, and such opinions are seldom so undisputed and clear as to lead to a high degree of certainty. But as like causes produce like results, it may be regarded as certain that if a certain condition of existing affairs has produced a nuisance, the same condition if reproduced will with certainly cause a like result.

"If," says Chancellor Williamson, in *Wolcott* v. *Melick, supra,* " the erection contemplated must, from its character, necessarily be a nuisance to the complainant, and his legal remedy is not adequate, the court will enjoin it." In *Duncan* v. *Hayes, 7 C. E. Gr. 25,* Chancellor Runyon, while refusing to enjoin the erection of a steam saw-mill because it was not clear that the business would in fact be a nuisance to the complainant, said : " If the injury was certain or without reasonable doubt I should not hesitate to grant the injunction." The case of *Newark Aqueduct Co.* v. *Passaic, supra,* was an application for a preliminary injunction, and the question whether the injury anticipated would be realized was the subject of conflicting expert testimony.

In *Attorney-General* v. *Manchester, supra,* the complainant failed to make out that there was a probability, much less a high degree of probability, that the apprehended danger (infection from a small-pox hospital) would in fact ensue.

In *Morgan* v. *Town of Binghamton, 102 N. Y. 500,* "the injury described in the findings," say the court, "was problematical, distant, merely possible and for three years yet it is certain no evil will result."

In *Hayes* v. *Village of Dwight, supra,* and in *Robb* v. *Village of La Grange, 158 Ill. 21,* the threatened construction of sewers by municipalities was enjoined without any judicial establishment in an action at law of the prospective nuisance, because it was clear that the nuisance would follow the use of the sewer.

As already remarked, I regard it as entirely clear that the discharge here threatened will create a nuisance. I think it equally clear that it will specially injure the property of complainants. As it will be a continuing injury it is regarded as irreparable at law. It is also included within a class of nuisances which, while it injures in a degree many owners of property in common and may even be indictable, is regarded as inflicting a special injury upon each property. *Wood Nuis.* §§ *602, 608.*

I will advise a decree enjoining the proposed discharge of sewage.